**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **REEDHYCALOG UK, LTD. and** | § | |
| **REEDHYCALOG, LP** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CASE NO. 6:08-CV-325** |
| **vs.** | § | **PATENT CASE** |
| | § | |
| **DIAMOND INNOVATIONS INC.** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' (collectively, "ReedHycalog") Motion for Prejudgment and

PostJudgment Interest (Docket No. 312), ReedHycalog's Motion for an Order Finding Exceptional

Case and Awarding Enhanced Damages and Attorneys' and Expert's Fees (Docket No. 313),

ReedHycalog's Motion for Entry of a Permanent Injunction (Docket No. 314), and Diamond

Innovations, Inc.'s ("Diamond Innovations") Motion for Judgment as a Matter of Law

Notwithstanding the Jury's Verdict on Invalidity and Non-Infringement and Alternative Motion for

a New Trial (Docket No. 315).  For the reasons stated below, Diamond Innovations' Motion for

Judgment as a Matter of Law Notwithstanding the Jury's Verdict on Invalidity and Non-Infringement

and Alternative Motion for a New Trial is **DENIED**, ReedHycalog's Motion for Prejudgment and

PostJudgment Interest is **GRANTED**, ReedHycalog's Motion for an Order Finding Exceptional

Case and Awarding Enhanced Damages and Attorneys' and Expert's Fees is **GRANTED** in part,

and ReedHycalog's Motion for Entry of a Permanent Injunction is **GRANTED**.

## BACKGROUND

This case involves nine related ReedHycalog patents,[1] which generally describe partially-leached polycrystalline diamond ("PCD") elements with the thermal characteristics of fully-leached PCD elements and the impact strength of traditional PCD elements.  ReedHycalog's Patents are directed to PCD elements that attach to drill bits and engage the drilled formation.  ReedHycalog's Patents claim this invention three different ways: (1) requiring a specific leach depth (the "Depth Patents[2]"); (2) requiring a leach depth such that the PCD body exhibits certain thermal properties (the "Thermal Characteristic Patents[3]"); and (3) requiring a leach depth such that the leached portion of the PCD body has substantially the same impact strength as an unleached portion (the "Impact Strength Patent[4]").

ReedHycalog's Patents have gone through extensive litigation over the past five years—this case is the fourth lawsuit that involves these patents.  Before this case, ReedHycalog brought suit against Baker Hughes Oilfield Operations, Inc., Halliburton Energy Services, Inc., and U.S. Synthetic Corporation in May 2006.  *ReedHycalog U.K., Ltd. v. Baker Hughes Oilfield Operations, Inc.*, Case No. 6:06-cv-222, Complaint (Docket No. 1) (E.D. Tex. May 12, 2006).  ReedHycalog next brought suit against United Diamond Drilling Services, Inc., Varel International Ind., L.P., and Ulterra Drilling Technologies, L.P. in June 2007.  *ReedHycalog U.K., Ltd. v. United Diamond Drilling*

---

[1] The nine patents-in-suit are: U.S. Patent Nos. 6,749,033, 6,589,640, 6,544,308, 6,797,326, 6,562,462, 6,878,447, 6,861,098, 6,861,137, and 6,601,662 (collectively, "ReedHycalog's Patents").

[2] The "Depth Patents" are the '033, '640, '308, '326, and '462 Patents.

[3] The "Thermal Characteristic Patents" are the '447, '098, and '137 Patents.

[4] The "Impact Strength Patent" is the '662 Patent.

*Servs., Inc.*, Case No. 6:07-cv-251, Complaint (Docket No. 1) (E.D. Tex. June 4, 2007).  In a third suit, ReedHycalog sued United Diamond, L.P. in October 2008.  *ReedHycalog U.K., Ltd. v. United Diamond, LP*, Case No. 6:08-cv-413, Complaint (Docket No. 1) (E.D. Tex. Oct. 27, 2008).  All of the defendants in these prior suits settled before trial for significant sums and ongoing license agreements.  During the trial of the instant case, both parties without objection acknowledged before the jury that ReedHycalog had license agreements with over 95% of the drill bit industry generating over $100 million dollars per year in ongoing royalty payments to ReedHycalog.  Both sides argued to the jury that their verdict in the instant case would have an effect on the industry and ReedHycalog's $100 million annual royalty stream.

Both parties acknowledged before the jury that ReedHycalog had offered and continued to offer Diamond Innovations the same no royalty supply agreement it had given to other cutter manufacturers[5] whereby Diamond Innovations would pay no royalties provided it would only sell cutters to licensed bit manufacturers, who represent over 95% of the bit market.   Diamond Innovations rejected ReedHycalog's no royalty supply agreement and continued to press its declaratory judgment action of invalidity even though its partially leached cutters accounted for only 2.2% of its total annual revenue. Damages were not submitted to the jury because the parties stipulated past damages in the amount of $1.5 million.

After a six day trial, the jury found that ReedHycalog's Patents were not anticipated and not invalid, that Diamond Innovations literally infringed ReedHycalog's Patents, and that the infringement was willful.

---

[5]  Other cutter manufacturers who had entered into this supply agreement included Data Pack, Element Six, and U.S. Synthetic.

**DIAMOND INNOVATIONS' MOTION FOR JUDGMENT AS A MATTER OF LAW NOTHWITHSTANDING THE JURY'S VERDICT ON INVALIDITY AND NONINFRINGEMENT AND ALTERNATIVE MOTION FOR A NEW TRIAL**

Diamond Innovations moves for judgment as a matter of law on invalidity of ReedHycalog's Patents based on anticipation and non-infringement of the Thermal Characteristic Patents. Diamond Innovations also moves for a new trial on four grounds: ReedHycalog's closing argument, the Court's granting of judgment as a matter of law on obviousness, the Court's jury instructions, and the Court's evidentiary rulings.

***Judgment as a Matter of Law and New Trial Standards***

"The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Summit Tech. Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004). In the Fifth Circuit, judgment as a matter of law may not be granted unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir.1995) (internal quotation marks omitted). A court reviews all the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party, however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the

trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985).

***Judgment as a Matter of Law on Invalidity and Non-infringement***

Diamond Innovations moves for judgment as a matter of law on invalidity of ReedHycalog's Patents based on anticipation by U.S. Patent No. 4,224,380 (the "Bovenkerk-Gigl Patent"), which was filed on March 28, 1978. Three different patent examiners at the United States Patent and Trademark Office have examined ReedHycalog's Patents. *See, e.g.*, '098 Patent, '662 Patent, '033 Patent. Diamond Innovations asserts that ReedHycalog's Patents are anticipated by the Bovenkerk-Gigl Patent and they claim features that are inherent properties of partially leached PCD elements.

Dr. Hall, President of Novatek, a company involved in the manufacturing, research, and development of polycrystalline diamond products, testified as ReedHycalog's technical expert. *See* TT 6/4/10 a.m. at 7:24–8:9. Dr. Gigl, an inventor of the Bovenkerk-Gigl Patent, testified as Diamond Innovations' technical expert. As part of his analysis, Dr. Gigl manufactured cutters in 2009, allegedly in accordance with the teachings of Example IV in the Bovenkerk-Gigl Patent. *See* TT 6/8/10 a.m. at 48:12–63:23; 100:11–101:15. Based on Dr. Hall's expert testimony regarding what the Bovenkerk-Gigl Patent itself lacked and the accuracy of the cutters Dr. Gigl made in 2009, ReedHycalog presented significantly more than sufficient evidence to support the jury's finding of no anticipation. TT 6/9/10 p.m. 40:21–41:11, 50:15–52:18; TT 6/4/10 a.m. at 38:17–39:22, 41:23–42:4.

Diamond Innovations also moves for judgment as a matter of law on the issue of non-infringement of the Thermal Characteristic Patents based on the thermal gradient limitation.

5

Diamond Innovations argues that the testimony ReedHycalog presented about the thermal gradient limitation is per se unreliable, while Diamond Innovations presented reliable evidence that the thermal gradient limitation is scientifically impossible. After a review of the entire record, ReedHycalog clearly presented sufficient testimony based on credible expert analysis that the Thermal Characteristics Patents' thermal gradient limitation was present in the accused cutters. *See* TT 6/4/10 a.m. at 79:3–84:22, 108:25–109:4. Drawing all reasonable inferences in favor of ReedHycalog, there is more than sufficient evidence for a reasonable jury to conclude that Diamond Innovations' accused products infringe ReedHycalog's Patents.

### New Trial

Diamond Innovations moves for a new trial on four grounds: 1) ReedHycalog's closing argument, 2) the Court's granting of judgment as a matter of law on obviousness, 3) the Court's jury instructions for oral corroboration, anticipation, and willfulness, and 4) the Court's evidentiary rulings.

First, Diamond Innovations argues ReedHycalog's closing argument was improper and highly prejudicial because ReedHycalog suggested that Diamond Innovations was conspiring with ReedHycalog's licensees to challenge ReedHycalog's Patents without any evidentiary support. ReedHycalog's closing statement was entirely proper and based on facts and evidence in the record. The jury was aware, as Diamond Innovations admitted, that ReedHycalog had licensed its patents to at least 95% of the drill bit industry, who wanted to avoid paying the royalty. TT 6/4/10 p.m. at 81:2–8; TT 6/7/10 p.m. at 96:5–10; 98:8–99:16. The jury also knew that Diamond Innovations declined to enter a royalty-free, supply agreement with ReedHycalog that other cutter manufacturers

had entered. *See* TT 6/7/10 p.m. at 96:5–100:5. Finally, Diamond Innovations wholly failed to object to the very part ReedHycalog's closing argument it now complains of, and thus waived any objection or possible basis for a new trial. *See z4 Techs., Inc. v. Microsoft Corp.*, No. 6:06-CV-142, 2006 WL 2401099, at *18 (E.D. Tex. Aug 18, 2006) (Davis, J.); FED. R. EVID. 103. Regardless, ReedHycalog's closing statement was proper attorney argument based on the evidence and issues and does not warrant a new trial.

Second, the Court properly granted judgment as a matter of law on obviousness. During trial, Diamond Innovations presented no expert testimony that ReedHycalog's Patents were invalid for obviousness. At Diamond Innovations' request, the Court gave it an opportunity to review the record and file a motion regarding any testimony about obviousness at trial. TT 6/9/10 p.m. at 124:25–125:12; 139:6–18. Diamond Innovations did not file such a motion. Further, Diamond Innovations chose not to seek an instruction on obviousness, effectively conceding that there was no evidence of obviousness in the record. *See* E-mail from Diamond Innovations' attorney to the Court's law clerk, Exhibit FF, ReedHycalog's Opposition to Diamond Innovations' Motion for Judgment as a Matter of Law (Docket No. 329).

Third, Diamond Innovations argues that the Court incorrectly instructed the jury on oral corroboration, anticipation, and willfulness. The oral corroboration instruction was necessary because Diamond Innovations did not rely solely on the Bovenkerk-Gigl Patent to prove invalidity based on anticipation. Diamond Innovations also relied on Dr. Gigl's testimony about his work that led to the Bovenkerk-Gigl Patent and the 2009 cutters he made allegedly in accordance with the Bovenkerk-Gigl Patent. TT 6/7/10 p.m. at 152:12–162:8; TT 6/8/10 a.m. at 23:9–28:16,

48:12–63:23, 100:11–101:15.   Diamond Innovations also argues that the jury instructions on anticipation were erroneous.   However, Diamond Innovations failed to timely object to the Court's proposed charge regarding inherent anticipation, undue experimentation, and prior patent, thus it waived any objection to the instructions.   *See* TT 6/9/10 p.m. at 126:14–157:2.   Finally, the Court's instruction on willfulness was in accordance with the Federal Circuit's standard as set out in *Seagate*. *In re Seagate*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) ("We fully recognize that 'the term [reckless] is not self-defining.' . . . [A] patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

Fourth, in contesting the Court's evidentiary rulings, Diamond Innovations merely rehashes the same arguments it previously made to the Court.   The Court has already ruled on the various issues and declines to reconsider the matters.

Accordingly, the court **DENIES** Diamond Innovations' motion for judgment as a matter of law and new trial.

## REEDHYCALOG'S MOTION FOR AN ORDER FINDING EXCEPTIONAL CASE AND AWARDING ENHANCED DAMAGES AND ATTORNEYS' AND EXPERT'S FEES

The jury found that Diamond Innovations willfully infringed ReedHycalog's Patents. ReedHycalog moves for a finding of exceptional case, trebling damages under 35 U.S.C. § 284, and awarding attorneys' and expert's expenses under 35 U.S.C. § 285.

### *Attorneys' Fees and Costs*

Attorneys' fees and costs may be awarded in "exceptional cases" to the "prevailing party." 35 U.S.C. § 285.   A case may be exceptional based solely on litigation misconduct and

unprofessional behavior. *Rambus, Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1106 (Fed. Cir. 2003); *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir. 2002). A case may be deemed exceptional on a party's or its counsel's display of bad-faith during either the pre-trial or trial stages. *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1580 (Fed. Cir. 1986) (overruled on other grounds). The prevailing party seeking an attorneys' fee award has the burden of establishing that the case is exceptional by clear and convincing evidence. *Reactive Metals & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1582 (Fed. Cir. 1985) (overruled on other grounds).

A finding of willful infringement is a factor to be considered in determining if a case is exceptional. *See Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1329 (Fed. Cir. 1987). ReedHycalog argues that an award of fees and costs is appropriate because of the finding of willfulness alone. However, "exceptional cases" may, but are not required to, include the jury's finding of willfulness. *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 518 F. Supp. 2d 876, 895 (S.D. Tex. 2007) (citing *Avia Group Int'l, Inc. v. L.A. Gear Ca., Inc.*, 853 F.2d 1557, 1567 (Fed. Cir. 1988)). "The decision to increase damages is committed to the discretion of the trial judge . . . ." *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990).

In its motion, ReedHycalog presents multiple instances where Diamond Innovations acted in bad faith and committed litigation misconduct sufficient to make this an exceptional case. The Court discusses the more egregious actions here.

First, Diamond Innovations' communications with Regan Fay, including the Fay memo, were improperly concealed and withheld. Regan Fay, an attorney at Jones Day, wrote a memo regarding the validity of ReedHycalogs' Patents in light of the Bovenkerk-Gigl Patent. Diamond Innovations

asserts that Mr. Fay was only Diamond Innovations' business and litigation lawyer, not its patent lawyer. HT 4/6/10 at 33:32–34:2. However, contrary to Diamond Innovations' representation, Mr. Fay is a former patent examiner at the U.S. Patent and Trademark office and a former law clerk at the U.S. Court of Customs and Patent Appeals, and thus, a seasoned patent attorney, who reviewed the patents at issue and rendered opinions to Diamond Innovations. Exhibit 9, ReedHycalog's Motion for Exceptional Case (Docket No. 313).

Diamond Innovations voluntarily waived any attorney client and work product privileges when it produced opinion of counsel documents by James Singer as a defense to willfulness. However, it repeatedly asserted privilege over all communication with Regan Fay. Initially, Diamond Innovations claimed privilege in the depositions of its employees regarding their communications with Regan Fay. Exhibit 7, ReedHycalog's Motion for Exceptional Case (Docket No. 313). Subsequently, ReedHycalog filed a Motion to Compel to obtain the Fay communications. ReedHycalog's Motion to Compel (Docket No. 84). Based on an *in camera* review of the Fay documents, the Court determined the Fay documents were plainly within the scope of its waiver and not withheld in good faith, and ordered their production. Order (Docket No. 204).

The Fay communications revealed that Mr. Fay was specifically retained to provide a patent opinion. PTX 0617. Further, the communications also revealed that Mr. Fay wrote a memo regarding ReedHycalog's patents, which was not produced. Court Hearing Exhibit 1, at 10 (tendered May 25, 2010); *see also* PT 6/25/10 at 3:17–11:13. Diamond Innovations claimed to have no knowledge of the memo but was able to obtain a copy of it from Mr. Fay for this case. PT 6/25/10 at 6:18–7:7; *see also* Declaration of Regan Fay, Exhibit B, Diamond Innovations' Opposition to

ReedHycalog's Motion for Exceptional Case (Docket No. 328).  However, in an e-mail on March 29, 2005 from Mr. Fay to Marc Davidson, Diamond Innovations' Executive Vice-President for Technology and Operations, Mr. Fay stated that they "should discuss . . . the action items in my 11/22/04 memorandum."  Court Hearing Exhibit 1, at 10.  There is no evidence of a response from Mr. Davidson stating that he did not know what memo Mr. Fay was referencing.  Further, one of the actions items in the Fay memo was for "Marc Davidson to search for all Bovenkerk laboratory notebooks and reports, as well as other relevant internal GE documents."  PTX 0632, at 8.  Then on February 10, 2005, a Leaching Strategy was developed where the "recommended action" was to "hire consultants . . . to actively search CRD and corporate archives – DRC" because "GE [wa]s unlikely to do this quickly enough for [their] needs."  Court Hearing Exhibit 1, at 8.  The Leaching Strategy plausibly follows from an action item in the Fay memo.  Finally, between November 17 and 24, 2004, several calendar events and e-mails were exchanged regarding phone communications between Mr. Davidson and Mr. Fay about Diamond Innovations' alleged right to practice leaching of cutters.  *Id.* at 1–7.  These communications appear to have been memorialized in the contemporary November 24, 2004 Fay memo.

Diamond Innovations only produced the Fay memo after the Court ordered it to do so.  Order (Docket No. 271).  The Fay memo is clearly an opinion of counsel, not merely general business legal advice as Diamond Innovations had characterized it.  PTX 0632.  Diamond Innovations blatantly failed to comply with the Court's Docket Control Order and the Eastern District's Local Rules when it withheld its communication with Mr. Fay that squarely fell within its waiver.

Second, Diamond Innovations repeatedly burdened the Court with unnecessary motion

practice throughout this case.  For example, Diamond Innovations filed a motion to reconsider the Court's previous order excluding its reliance on cutters made in 2004 that Diamond Innovations had failed to retain.  Diamond Innovations' Motion for Clarification and Reconsideration (Docket No. 169).  The motion simply restated the same arguments Diamond Innovations previously made.  *Id.* Diamond Innovations also filed a completely meritless motion requesting the production of all communications between ReedHycalog and its trial counsel based on the accidental production of a small number of privileged documents that were promptly clawed back.  Diamond Innovations' Motion to Compel Production (Docket No. 174).  Not only was the claw back procedure explicitly set out in the Agreed Protective Order and followed by ReedHycalog, but Diamond Innovations itself committed the same error multiple times and more egregiously.  Agreed Protective Order, at 5 (Docket No. 39); ReedHycalog's Opposition to Defendant's Motion to Compel, at 4–5 (Docket No. 191).

Yet another example is Diamond Innovations' failure to properly plead inequitable conduct. Based on Diamond Innovations' initial failure to properly plead inequitable conduct, ReedHycalog filed a Motion for Judgment on the Pleadings, which was fully briefed.  ReedHycalog's Motion for Judgment on the Pleadings (Docket No. 99).  Diamond Innovations subsequently filed a Second Amended Answer where it added more substance to its inequitable conduct claim, but it failed to first seek leave of Court as required by the Docket Control Order.  *See* Docket Control Order, at 7 (Docket No. 31); Diamond Innovations' Second Amended Answer (Docket No. 107). Because Diamond Innovations refused to seek leave of Court or withdraw the pleading, ReedHycalog had to file a Motion to Strike the Second Amended Answer.  ReedHycalog's Motion to Strike (Docket No.

111).  Then, Diamond Innovations finally sought leave of Court to file a Third Amended Answer,

which the Court reluctantly granted in part.[6]  Diamond Innovations' Motion for Leave to Amend

(Docket No. 120).  Then, during trial Diamond Innovations abandoned its inequitable conduct

allegation, which had created so much briefing.  Diamond Innovations provides no reasonable

explanation for this series of events.  Diamond Innovations' attempt to constantly circumvent the

Local Rules generated a needless amount of motion practice related to inequitable conduct, which

unfairly burdened ReedHycalog and wasted the Court's resources.

In addition, Diamond Innovations committed many other instances of litigation misconduct.

At depositions, Diamond Innovations repeatedly interrupted testimony by making improper

objections that were contrary to the Local Rules.  Exhibit 12, ReedHycalog's Motion for Exceptional

Case (Docket No. 313); *see* Local Rule CV-30.  Also, its counsel improperly conferred with Dr. Gigl

during a break in his deposition, which led him to change his answer to an important question, and

then refused to let him answer questions about the discussion with counsel even though he was a

testifying expert.  Exhibit 13, ReedHycalog's Motion for Exceptional Case (Docket No. 313).

Further, Diamond Innovations failed to mediate in good faith.  During trial, in an attempt to resolve

this case, the Court ordered the parties to mediate on the evening of June 3, 2010.  TT 6/3/10 a.m.

at 169:19–22.  Diamond Innovations chose to ignore the Court's order and did not participate in the

mediation as ordered.  While the Court recognizes that parties may reach an impasse, it is

---

[6] The Court denied Diamond Innovations' Motion for Leave to Amend its Second Amended Answer and Counterclaim (Docket No. 120) as to Paragraphs 104–110 of Diamond Innovations' Third Amended Answer and Counterclaim, which detailed Diamond Innovations' claim of inequitable conduct based on failure to disclose the best mode.  The Court granted the motion in all other respects, including the details of two additional, alternative grounds of inequitable conduct.

unacceptable for a party to unilaterally choose not to participate in mediation when the Court has ordered it to do so, especially where the party not participating has been offered a no cost supply agreement allowing it to sell its cutters with no royalty to over 95% of the market.

The Court is concerned by the repeated instances of litigation misconduct committed by Diamond Innovations, particularly its attempt to conceal relevant and discoverable but damaging documents. Diamond Innovations' conduct throughout this case falls far below the Court's standards for professionalism and collegiality. Based on Diamond Innovations' litigation misconduct and willfulness, the Court deems this case exceptional. Accordingly, the Court awards ReedHycalog reasonable attorneys' fees and expenses.

When determining a reasonable attorneys' fee award, a court should consider all relevant circumstances in a case. *Junker v. Eddings*, 396 F.3d 1359, 1365 (Fed. Cir. 2005). In determining such an award, a court usually analyzes "hourly time records, full expense statements, documentation of attorney hourly billing rates in the community for the particular type of work involved, the attorney's particular skills and experience, and detailed billing records or client's actual bills showing tasks performed in connection with the litigation." *Id*. at 1366.

ReedHycalog presented the Court with very detailed billing records, including full hourly time records. *See, e.g.,* Exhibit 17, ReedHycalog's Motion for Exceptional Case (Docket No. 313). Based on the information provided by ReedHycalog, the total combined fees and expenses incurred by ReedHycalog for this case amount to $5,266,884.00.

ReedHycalog also provided the Court with an excerpt from the 2009 American Intellectual Property Law Association's Report of the Economic Survey, which indicates that the average billing

rate for partners and associates in private law firms in Texas are $590/hr and $385/hr (third quartile, 75%), respectively. *See* Exhibit 2, Reply to ReedHycalog's Motion for Exceptional Case (Docket No. 335). Further, Diamond Innovations' attorneys' fees have amounted to $5,069,442.50. ReedHycalog's fees and expenses associated with this case are reasonable considering the complexity of the case, the comparable amount spent by Diamond Innovations, and the results ReedHycalog's attorneys achieved at trial. Based on all of the relevant circumstances in the case, the Court awards $5,266,884.00 in attorneys' fees to be paid to ReedHycalog.

The Court also awards ReedHycalog its fees and expenses related to testing its expert, David Hall, performed. ReedHycalog filed a Motion for Summary Judgment of Infringement well before trial, and Diamond Innovations' main opposition to the motion was that ReedHycalog failed to provide enough evidence of infringement of each of its cutters. ReedHycalog's Motion for Summary Judgment (Docket No. 83); Diamond Innovations' Response to Plaintiffs' Motion for Summary Judgment (Docket No. 87). This forced ReedHycalog to spend millions of dollars for Dr. Hall to conduct very expensive testing of numerous infringing products in order to prove infringement. Diamond Innovations chose to put ReedHycalog through very expensive and probably unnecessary testing to prove infringement, and Diamond Innovations does not even contest the jury's finding of infringement of the Impact Strength and Depth Patents, which amplifies how excessive and unnecessary much of the testing was. In short, Diamond Innovations created an issue, when in all probability there was none, and Diamond Innovations either knew or should have known there was none.

ReedHycalog presented the Court with detailed billing records and detailed records of David

Hall's material and supply expenses incurred broken down into the categories of consulting, testing, and trial work.  For testing, the total combined fees and expenses incurred by ReedHycalog in this case amount to $3,043,267.00.

The Court awards ReedHycalog its costs for expert fees related to only testing of the infringing products in the amount of $3,043,267.00.

### *Enhanced Damages*

A court has discretion to enhance damages up to three times when there is a finding of willful infringement or bad-faith on the part of an infringing party.  35 U.S.C. § 284; *see SRI Int'l, Inc. v. Advanced Techs. Labs., Inc.*, 127 F.3d 1462, 1468-69 (Fed. Cir. 1997).  "Bad faith" in this context refers to an infringer's lack of due care with regard to avoiding infringement and is more properly called "bad faith infringement."  *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1571 (Fed. Cir. 1996).  Although "bad faith" acts such as litigation misconduct are not sufficient alone to support an enhanced damages, assuming the requisite culpability is present, such acts can be considered in determining whether to award enhanced damages and how much to award.  *See id.* at 1570-71.  A finding of willful infringement provides sufficient culpability to justify the enhancement of damages under § 284.  *See id.* at 1571, 1573.

Enhanced damages are a punitive measure taken by a court to penalize a willful infringer for its increased culpability.  *See id.* at 1570.  However, a court can refrain from awarding enhanced damages in light of a finding of willfulness based on the weight of the evidence supporting willfulness and the closeness of the issues at trial.  *See Brooktree Corp. v. Advanced Micro-Devices, Inc.*, 977 F.2d 1555, 1582 (Fed. Cir. 1992); *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed.

Cir. 1997).  "The paramount determination in deciding enhancement and the amount thereof is the egregiousness of the defendants' conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992), abrogated on other grounds by *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed. Cir. 1995) (en banc).  Factors courts consider in deciding whether to enhance damages and the amount of enhancement include: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) duration of the defendant's misconduct; (7) remedial action by the defendant; (8) the defendant's motivation for harm; (9) whether the defendant attempted to conceal its misconduct.  *Id.* at 827.

The jury found that Diamond Innovations willfully infringed ReedHycalog's Patents.  The only two factors that are neutral in considering enhanced damages in this case are Diamond Innovations' size and financial condition under factor four and its motivation for harm under factor eight.  All of the other factors weigh heavily in favor of the enhancement of damages.

Under factor one, ReedHycalog presented more than sufficient evidence that Diamond Innovations attempted to copy ReedHycalog's commercial cutter, TreX.  *See* PTX 0116; TT 6/7/10 a.m. at 34:24–39:1, 45:23–47:22.  Under factor two, as indicated by the jury's willfulness finding, Diamond Innovations could not have formed a good faith belief that ReedHycalog's Patents were invalid and not infringed based on the Fay memo and the Bovenkerk-Gigl Patent.  *See* PTX 0632; U.S. Patent No. 4,224,380 (filed Mar. 28, 1978).  Diamond Innovations argues that the Court should

17

consider James Singer's opinions of counsel in its determination of whether to award enhanced damages based on willfulness.  The Court only excluded portions of the Singer opinions that were based on cutters manufactured and discarded in 2004, but did not exclude Singer's opinions in their entirety.  Order (Docket No. 142).  Diamond Innovations did not call Mr. Singer to testify at trial or offer non-excluded portions of his opinions into evidence.  Further, it did not make an offer of proof at trial of the Singer opinions.  Since they were never offered in evidence, the Court declines to consider the Singer opinions in its assessment of enhanced damages.

Under factor three, Diamond Innovations' litigation misconduct, as described in detail above, heavily weighs in favor of ReedHycalog.  Factor four is neutral because although Diamond Innovations' cutter sales are smaller than ReedHycalog's royalties on cutters, the partially leached cutters at issue make up only 2.2% of Diamond Innovations' total annual revenue.

Under factor five, this was not a close case.  Diamond Innovations did not even contest the jury's finding of infringement on six of the nine patents-in-suit.  Diamond Innovations' Motion for Judgment as a Matter of Law (Docket No. 315).  Three different patent examiners considered the Bovenkerk-Gigl Patent and issued ReedHycalog's Patents over the Bovenkerk-Gigl Patent. *See, e.g.*, '098 Patent, '662 Patent, '033 Patent.  The Bovenkerk-Gigl Patent itself was deficient and needed to be supplemented with information from the cutters made by Dr. Gigl in 2009. *See* TT 6/8/10 p.m. 100:11–103:13.  Under factors six and nine, Diamond Innovations began manufacturing and selling the infringing cutters in 2004.  Although Diamond Innovations alleges that ReedHycalog delayed bringing suit, that delay was fostered by Diamond Innovations' attempt to conceal its infringing activities. *See, e.g.,* PTX 0189.

18

Under factor seven, Diamond Innovations has admittedly failed to take any remedial action. Finally, under factor eight, based on the facts of this case and weighing what is at stake for Diamond Innovations versus for ReedHycalog, it appears that Diamond Innovations sought to gain favor and a competitive edge in the industry by invalidating ReedHycalog's Patents.

The totality of circumstances in this case justify enhancing damages under § 284. Although stipulated actual damages were low ($1.5 million), the risk to ReedHycalog was high ($100 million royalty stream). *See* TT 6/4/10 p.m. at 48:14–19. Thus, the Court awards treble damages in the amount of $4,500,000.00 for Diamond Innovations' willful infringement and litigation misconduct.

Accordingly, the Court **GRANTS** in part ReedHycalog's motion for exceptional case and awarding enhanced damages and attorneys' and expert's fees. The Court **GRANTS** the motion as to enhanced damages in the amount of $4,500,000.00. The Court further **GRANTS** the motion as to attorneys' fees in the amount of $5,266,884.00 and as to the expert's fees in the amount of $3,043,267.00 for testing and **DENIES** the motion as to the expert's fees for consulting and trial work.

## REEDHYCALOG'S MOTION FOR
## PREJUDGMENT AND POSTJUDGMENT INTEREST

ReedHycalog moves for prejudgment and postjudgment interest. ReedHycalog requests prejudgment interest be calculated using the annual prime rate compounded annually on the stipulated $1.5 million damages award. Interest shall be allowed on any money judgment in a civil case recovered in a district court. 28 U.S.C. § 1961(a) (2006). Prejudgment interest must be awarded and any justification for withholding the award must have a relationship with the award of prejudgment interest itself. *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983). The

19

interest rate used to calculate prejudgment interest and the method and frequency of compounding is left to the discretion of the district court. *Studiengesellschaft Kohle, m.b.H. v. Dart Indus.,* Inc., 862 F.2d 1564, 1579–80 (Fed. Cir. 1988).

Diamond Innovations argues that ReedHycalog is not entitled to prejudgment interest because ReedHycalog delayed filing suit and stipulated to damages of $1.5 million for past infringement. However, Diamond Innovations attempted to conceal the leached nature of the cutters it was selling. PTX 58, 189; TT 6/7/10 a.m. at 76:11–81:24. Further, neither party stated that the stipulation on the amount of past damages included prejudgment interest. TT 6/8/10 p.m. at 2:18–4:19. Accordingly, the Court **GRANTS** ReedHycalog's motion for prejudgment and postjudgment interest, and ReedHycalog is awarded prejudgment interest calculated at the annual prime rate compounded annually, $155,424.00 through June 30, 2010, and post-judgment interest at the lawful federal rate pursuant to 28 U.S.C. § 1961.

## REEDHYCALOG'S MOTION FOR ENTRY OF A PERMANENT INJUNCTION

ReedHycalog moves to permanently enjoin Diamond Innovations from directly or indirectly infringing ReedHycalog's Patents. More specifically, ReedHycalog requests the injunction state:

Diamond Innovations, its agents, representatives, and affiliates, be enjoined from making, using, selling or offering to sell in the United States, or importing into the United States, any partially leached polycrystalline diamond cutting element (PDC) that infringes any of the ReedHycalog Patents, including the following partially leached cutting elements or mere colorable variations thereof:

1. PDC cutters that have diamond table formed on a substrate, wherein the diamond table has a leached region or volume and an unleached region or volume, wherein the leached volume is substantially free of catalyzing material, and wherein the depth of the leached region or volume is at least 0.1mm in depth;

2. PDC cutters that have diamond table formed on a substrate, wherein the diamond table has a leached region or volume and an unleached region or volume, wherein the leached volume is substantially free of catalyzing material, and wherein the leached region or volume and the unleached region or volume have substantially the same impact strength;

3. PDC cutters that have diamond table formed on a substrate, wherein the diamond table has a leached region or volume that extends to a depth and an unleached region or volume, wherein the leached volume is substantially free of catalyzing material, and wherein the cutter exhibit a thermal characteristic such that a 950 degrees C. temperature at the working surface results in a temperature of less than 750 degrees C. at the depth;

4. the Adjudicated Infringing DI Cutters; and

5. all of DI's "Ultra" designated partially leached cutters (or cutters made according to the same parameters as the "Ultra" cutters regardless of name).

The decision to grant or deny injunctive relief is within district courts' discretion, which should be exercised consistent with traditional principles of equity. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006). A party is entitled to a permanent injunction only if: "1) [the party] has suffered an irreparable injury; 2) that remedies at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the [parties], a remedy in equity is warranted; and 4) that the public interest would not be disserved by a permanent injunction." *Id.* at 391.

Under the first and second *eBay* factors, ReedHycalog has shown that it would be irreparably harmed without a permanent injunction and that harm cannot be compensated with monetary damages. ReedHycalog argues that its well-established licensing program does not justify denial of an injunction because it has never licensed to a cutter manufacturer. Diamond Innovations counters that ReedHycalog has entered into a license agreement with Halliburton Energy Services, Inc., a

cutter manufacturer.    ReedHycalog licenses its patents on cutter technology to drill bit manufacturers—its direct competitors—who incorporate the cutters into their drill bits and pay royalties.    TT 6/4/10 p.m. at 79:11–80:11.    For cutter manufacturers, ReedHycalog enters into royalty-free, supply agreements where the cutter manufacturers agree to sell patented cutters to only ReedHycalog's licensed competitors.    *Id.* at 80:12–81:20.    A licensing agreement with Diamond Innovations, a cutter manufacturer who would induce infringement by drill bit manufacturers, would exhaust ReedHycalog's ability to collect royalties from its direct competitors.    Although ReedHycalog has licensed its technology on partially leached cutters to over 95% of the drill bit industry, it has licensed only to drill bit manufacturers.    TT 6/4/10/ p.m. at 79:10–81:4.    Contrary to Diamond Innovations' accusation, Halliburton is one of those drill bit manufacturers and is not a cutter manufacturer.    Halliburton is in a unique situation with ReedHycalog because of an unrelated Halliburton joint venture operation.    PT 7/22/10 at 50:18–52:10.

ReedHycalog also argues that it and its licensees will be disadvantaged without an injunction because Diamond Innovations would be able to sell to unlicensed drill bit manufacturers who would have a competitive pricing advantage.    Diamond Innovations fails to directly respond to these arguments and merely asserts that it is purely speculative that one of ReedHycalog's licensees would breach its contract with ReedHycalog to get a pricing advantage.    Because royalties from drill bit manufacturers allow ReedHycalog to both collect royalties from its direct competitors and collect higher royalties than from cutter manufacturers, ReedHycalog would be irreparably harmed if an injunction is not entered, regardless of any potential breach of contract issues.    *See* TT 6/4/10 p.m. at 79:11–80:8; ReedHycalog's Motion for Entry of a Permanent Injunction, at 6–7 (Docket No. 314).

Under the second *eBay* factor, monetary damages are inadequate to compensate for ReedHycalog's injury based on the reasons set forth above for *eBay* factor 1 regarding ReedHycalog's irreparably injury. Thus, the first and second *eBay* factors heavily weigh in favor of an injunction.

Third, the balance of hardships favors ReedHycalog. Diamond Innovations argues that it could potentially lose its entire cutter business if a permanent injunction were granted. Diamond Innovations further argues that ReedHycalog failed to show that the lack of an injunction would harm its business and that ReedHycalog cannot meet the demand for cutters itself. Diamond Innovations' assertions ring hollow. Partially leached cutters compromise only about 2.2% of Diamond Innovations' total annual revenues and about 20% of its total cutter sales, so a permanent injunction will clearly not create a significant hardship nor wipe out its cutter business. *See* DTX 672 at § SUM-310; TT 6/7/10 p.m. at 100:6–19; PT 7/22/10 at 49:12–5. Alternatively, the lack of an injunction has the potential to significantly disrupt ReedHycalog's business and licensing structure. *See, e.g.,* PTX 0240, § 8.04c at 21. Thus, the balance of hardships favors ReedHycalog.

Fourth, a permanent injunction will not harm the public. Diamond Innovations argues that the public is harmed by eliminating it as a cutter source in a market with strong demand. However, it is in the public interest to enforce patent rights. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010) ("[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects."). Further, the technology at issue does not implicate public health or safety concerns. *i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d

568, 601 (E.D. Tex. 2009), aff'd 598 F.3d 831 (Fed. Cir. 2010) ("[W]here products do not relate to a significant compelling public interest, such as health or safety, this factor weighs in favor of an injunction."). In addition, ReedHycalog has already contracted with three other cutter manufacturers who can supply the market with partially leached cutters that embody ReedHycalog's patented inventions. *See* TT 6/4/10 p.m. at 81:5–12. As a result, this fourth factor also favors a permanent injunction.

Importantly, ReedHycalog has offered and continues to offer Diamond Innovations a cutter manufacturer supply agreement. ReedHycalog seeks an injunction only because Diamond Innovations refused to enter into a royalty-free, supply agreement that applies to over 95% of the drill bit industry. As all four *eBay* factors favor an injunction and Diamond Innovations does not contest the scope of the injunction proposed by ReedHycalog, the Court **GRANTS** ReedHycalog's motion for permanent injunction and its proposed injunctive language is adopted in full.

## CONCLUSION

As stated, the Court **GRANTS** ReedHycalog's motion for prejudgment and postjudgment interest, **GRANTS** in part ReedHycalog's motion for exceptional case, enhanced damages, and attorneys' and experts' fees, **GRANTS** ReedHycalog's motion for permanent injunction, and **DENIES** Diamond Innovations' motion for judgment as a matter of law and new trial. The permanent injunction provided for herein will be memorialized in a separate order.

24

So **ORDERED** and **SIGNED** this 12th day of August, 2010.

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**